United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**
No. 97-1946

| | | |
|---|---|---|
| Michael Haley, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Nicolas P. Retsinas, Director of the | * | |
| Office of Thrift Supervision, | * | |
| | * | |
| Appellant. | * | |
| _____ | * | |
| | * | |
| Federal Deposit Insurance Corporation; | * | |
| Board of Governors of the Federal | * | |
| Reserve System; Office of the | * | |
| Comptroller of the Currency, | * | |
| | * | |
| Amicus Curiae. | * | |

_____

Submitted:  September 8, 1997
Filed:  March 16, 1998
_____

Before RICHARD S. ARNOLD, Chief Judge,  HEANEY, and BEAM, Circuit Judges.
_____

BEAM, Circuit Judge.

Nicolas P. Retsinas appeals from a judgment entered against him in the district court[1] for violating 12 U.S.C. § 1831j(a)(2), which prohibits termination of a banking employee who provides information to authorities regarding possible illegal activity. We affirm.

## I.    BACKGROUND

Michael Haley began working as a bank examiner for the Office of Thrift Supervision (OTS) in 1977. As an examiner, he inspected various OTS-regulated banks in order to evaluate the safety and soundness of their operations. In 1981, he was assigned to examine Marion County Mutual Loan and Building Association (MCM). MCM, like many other thrift institutions, suffered large capital losses in the early 1980's, as a result of high interest rates on deposits and low interest rates on mortgages. In 1986, MCM began to show signs of financial recovery. Haley believed that MCM's management played a key role in its improved condition. However, Robert Maffitt, the OTS supervisor responsible for the overall regulation of MCM, was not satisfied with the progress made toward restoring MCM's financial health by current management.

In 1989, Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), which changed the capital requirements for banks like MCM. Among the changes were (1) increased capital maintenance requirements; (2) different capital requirement standards; and (3) new deadlines in which to meet the new requirements. MCM was still below the standard in terms of its capital holdings, and the OTS was concerned about its ability to meet these new requirements. Maffitt requested that MCM provide the OTS with detailed plans for addressing its capital deficiencies. Furthermore, he asked MCM's board of directors to sign a consent

---

[1]The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

agreement allowing the OTS to seek out an appropriate acquiror or merger partner for MCM. The board refused, proposing instead to raise the necessary capital through a stock conversion. Additionally, the board suggested the use of MCM's $1,050,000 in net worth certificates as capital.

During an examination he conducted in July of 1989, Haley discussed the status of MCM with Bayard Plowman, MCM's managing officer. Haley remained favorably impressed with both the financial progress of MCM and the management skills of Plowman and the board of directors. Another OTS examiner who visited MCM in 1989, Carmen Gassert, shared Haley's positive views regarding the future of MCM. Gassert informed Maffitt that, in her opinion, the proposed stock conversion would involve a minimal insurance risk and was a feasible strategy for MCM to raise capital. Maffitt, however, continued to disagree with the assessments of both Haley and Gassert.

In January of 1990, pursuant to the new FIRREA legislation, MCM submitted a capital plan to the OTS. The plan called for capital enhancement by means of a stock conversion and a conversion of net worth certificates into core capital. The OTS disapproved of the plan, partly because it determined that a stock conversion posed too great a risk to the insurance fund. In addition, the OTS did not believe the net worth certificates were convertible into any instrument that would qualify as core capital. Upon researching the issue, however, Haley discovered that the certificates were indeed convertible into capital. He informed his OTS superiors of this, but they did not heed his comments. The OTS subsequently rejected MCM's capital plan.

Concerned by the OTS's apparently unfair and arbitrary treatment of MCM, Haley searched OTS files and found that the agency was determined to replace the current management at MCM. Maffitt, Haley discovered, intended to put MCM into receivership if he could not compel the board of directors to sign the consent agreement giving the OTS the power to authorize a sale or merger. He also learned that Roosevelt

Federal Savings and Loan (Roosevelt) was the most likely acquiror of MCM. Roosevelt, however, had a poor lending record in the community, and Haley regarded Roosevelt's acquisition of or merger with MCM as a breach of duty on the part of the OTS. Furthermore, Haley believed that both the forced merger and the refusal to recognize the capital value of the net worth certificates potentially violated federal banking laws and regulations.

Haley contacted Plowman at MCM with this information. Plowman told Haley that he intended to bring MCM's situation to the attention of Congress or the FDIC. Haley offered to write a letter to Congress on behalf of MCM, but Plowman advised that doing so might cost Haley his job. Haley then drafted a memorandum (the Haley Memo) dated July 3, 1990, outlining his understanding of the OTS's involvement with MCM. The Haley Memo was addressed to Maffitt, with copies to other superiors at the OTS and to Skip Sage, a state regulator of Marion County. In addition, although the OTS was unaware of it at the time, Haley forwarded a copy to Plowman at MCM. He attached a note instructing Plowman to use the memorandum in any way that would help save MCM from the OTS.

Shortly thereafter, Harold Chapman, the FDIC examiner in charge of an ongoing investigation of MCM, received two copies of the Haley Memo, one from Plowman and one from Carmen Gassert at the OTS. On July 17, 1990, Chapman showed his copy of the Haley Memo to Tim O'Leary, one of Haley's supervisors at the OTS, and told O'Leary that he had received it from Plowman. Upon learning that Haley had provided the memo to Plowman, the OTS terminated him for disclosing confidential OTS information to an outside third party. Haley appealed his discharge to the Merit Systems Protection Board (MSPB), claiming that he was a whistleblower entitled to protection under 5 U.S.C. § 2302(b)(8). The MSPB found that Haley did not meet the requirements for protection under the statute and upheld the discharge. The Federal Circuit Court of Appeals affirmed on the same grounds in 1992.

In the meantime, Congress amended 12 U.S.C. § 1831j to extend whistleblower protection to employees of federal banking agencies such as the OTS. The amendment was made retroactive to January 1, 1987. Invoking the new provision, Haley filed this action against Nicolas P. Retsinas, Director of the Office of Thrift Supervision, alleging that he was unlawfully retaliated against for indirectly providing information to the FDIC about possible violations of law. The district court, sitting without a jury, found in favor of Haley and awarded damages totaling $723,533 for back pay, future loss of income, and compensatory damages. Retsinas appeals, arguing, primarily (1) that Haley should be collaterally estopped from relitigating the issue of why he was terminated; (2) that Haley did not make a protected disclosure under section 1831j(a)(2); and (3) that Haley did not provide information regarding a possible violation of law.

## II.  DISCUSSION

### A.  Collateral Estoppel

Initially, Retsinas claims that Haley should not be permitted to relitigate the issue of the reason for his discharge, which was previously decided in the MSPB and the Federal Circuit Court of Appeals decisions. In the previous proceedings, the ALJ found that Haley was discharged because of his unauthorized disclosure to Plowman. Therefore, Retsinas argues, Haley is collaterally estopped from trying to prove that he was fired because of the disclosure to the FDIC.

"Under the doctrine of collateral estoppel, . . . the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979). Four requirements must be met before a finding in a previous action is conclusive in the instant action: (1) the issue must be identical to that involved in the prior proceeding; (2) the issue must have been

-5-

actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the judgment.  See Farmland Indus. Inc. v. Morrison-Quirk Grain Corp., 987 F.2d 1335, 1339 (8th Cir. 1993).

The issue in this case is not identical to the issue litigated before the MSPB and the Federal Circuit.  In the previous proceedings, the reason for Haley's discharge was determined specifically in the context of the section 2302(b)(8) action.  The ALJ found that Haley did not reasonably believe that the OTS had violated the law or abused its authority, and that he was fired because of the disclosure to Plowman.  The issue in this case differs for a number of reasons.  First, although section 2302(b)(8) requires that the whistleblower reasonably believe the employer has violated the law, section 1831j(a)(2) requires only that the disclosure contain information evidencing "any possible violation of any law."  The two determinations are not the same.  Second, the finding that Haley was fired for the disclosure to Plowman does not necessarily mean that he is not entitled to the protection of section 1831j(a)(2).  In the prior suit, Haley had no opportunity to litigate whether he was terminated because his disclosure to Plowman resulted in a disclosure to the FDIC.  Furthermore, in the present case, Haley was only required to show that the disclosure to the FDIC was a contributing factor in the OTS's decision to discharge him.  See Rouse v. Farmers State Bank, 866 F. Supp. 1191, 1207 (N.D. Iowa 1994).  Even if the OTS fired him because he gave the memo to Plowman, they may have also fired him because he gave the memo, albeit indirectly, to the FDIC.  Collateral estoppel is therefore inappropriate in this case.

### B.    The "Request" Requirement

Section 1831j(a)(2) provides:

No Federal banking agency . . . may discharge . . . any employee . . . because the employee (or any person *acting pursuant to the request of*

*the employee*) provided information to any such agency. . . or to the Attorney General regarding any possible violation of any law or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.

12 U.S.C. § 1831j(a)(2) (emphasis added). The statute includes the FDIC and the Director of the Office of Thrift Supervision in its definition of "Federal banking agency." 12 U.S.C. § 1831j(e). The parties agree (1) that Haley did not directly provide the memo to the FDIC, and (2) that Haley did not expressly request that Plowman give the memo to the FDIC. The district court found, however, that Haley told Plowman to use the memo to save MCM from perceived abuse by the OTS, that the FDIC was one of several possible destinations for the memo that Haley had considered, and furthermore, that Plowman and Haley had discussed Plowman's intention to contact Congress or the FDIC about the problem.[2] The court concluded that Haley's actions were within the scope of protected behavior under the statute. This is a mixed finding of law and fact, which we review de novo. See Loehrer v. McDonnell Douglas Corp., 98 F.3d 1056, 1061 (8th Cir. 1996). The issue before us is whether Haley's conduct was sufficient to constitute a "request" and thus to trigger the protection of section 1831j(a)(2). This court is unaware of any case law addressing this question, and we therefore view it as one of first impression.[3]

---

[2]These determinations were reached by the district court in its capacity as the fact-finder in this case. We accept the district court's findings of fact, because we do not find them to be clearly erroneous. See Black Hills Corp. v. Commissioner of Internal Revenue, 73 F.3d 799, 804 (8th Cir. 1996).

[3]We do recognize two cases, Walleri v. Fed. Home Loan Bank, 83 F.3d 1575 (9th Cir. 1996), and Nowlin v. Resolution Trust Corp., 33 F.3d 498 (5th Cir. 1994), both of which refused to extend whistleblower protection to employees who complained to authorities other than those specifically enumerated in the statute. These holdings, however, are not applicable to the situation presented in this case.

The first step in statutory interpretation is to look at the text of the statute itself. See United States v. Talley, 16 F.3d 972, 975 (8th Cir. 1994). If the plain meaning of the language clearly expresses the meaning Congress intended, the judicial inquiry ends there. See United States v. S.A., 129 F.3d 995, 998 (8th Cir. 1997), cert. denied, 1998 WL 54258 (U.S. March 9, 1998) (No. 97-7733). If, however, the language of the statute is ambiguous, we are obliged to consider "'the purpose, the subject matter and the condition of affairs which led to its enactment.'" Id. (quoting Lambur v. Yates, 148 F.2d 137, 139 (8th Cir. 1945)). "When the meaning of a statute is questionable, it should be given a sensible construction and construed to effectuate the underlying purposes of the law." S.A., 129 F.3d at 998.

In this case, the statute purports to cover situations in which the "employee (or any person acting pursuant to the request of the employee) provided information." Haley prepared the memo in question; he provided it to Plowman; he directed Plowman to provide it to someone with the authority to stop the OTS. Plowman then turned the memo over to the FDIC. In this scenario, was Plowman "acting pursuant to the request of" Haley when he provided information to the FDIC? On the one hand, Haley did not ask that Plowman give the memo to the FDIC. If the statute requires a request that specifically mentions the intended recipient of the information, then Plowman was not "acting pursuant to the request of" Haley and the statute does not cover the behavior. On the other hand, the word "request" does not necessarily dictate any level of detail. A "request" is "the act of asking for something to be given or done." The Random House Dictionary of the English Language 1636 (2d ed. 1987). Haley initially considered direct action, such as writing a letter to Congress or sending the memo directly to the Chairman of the FDIC, but he rejected the idea because he feared retaliation by the OTS. Instead, he prepared the memo and gave it to Plowman. He knew Plowman was already considering notifying Congress or the FDIC about the situation, and that Plowman was in contact with others outside the OTS who might be able to intervene. When he gave the memo to Plowman and asked Plowman to provide it to authorities who could help save MCM, that knowledge was implicit. We therefore

-8-

find that Haley's behavior was sufficient to constitute a "request." When Plowman provided the information to the FDIC, he was doing as Haley had suggested, and thus, was "acting pursuant to the request of" Haley.

Even if the text is ambiguous with respect to the meaning of "request," the policy and purposes behind the statute lead us to the same conclusion. Laws protecting whistleblowers are meant to encourage employees to report illegal practices without fear of reprisal by their employers. These statutes generally use broad language and cover a variety of whistleblowing activities. Accordingly, when the meaning of the statute is unclear from its text, courts tend to construe it broadly, in favor of protecting the whistleblower. This is often the best way to avoid a nonsensical result and "to effectuate the underlying purposes of the law." S.A., 129 F.3d at 998.

For example, the plaintiff in Neal v. Honeywell, Inc.[4] claimed that she was entitled to whistleblower protection under 31 U.S.C. § 3730(h), which applies to "any employee who" suffers retaliation "because of lawful acts done by the employee . . . in furtherance of . . . an action filed or to be filed" under the False Claims Act. Neal v. Honeywell, Inc., 33 F.3d 860, 861 (7th Cir. 1994). She reported her co-workers' fraud, but the United States eventually settled with the employer and no "action" under the False Claims Act was ever filed. The plaintiff was subsequently discharged and sought

---

[4]In our case, the district court cited Neal v. Honeywell, Inc., 826 F. Supp. 266, 270 (N.D. Ill. 1993), and Lao Chua v. St. Paul Fed. Bank for Sav., 1995 WL 472773 (N.D. Ill. 1995) (relying on the district court's language in Neal), for the proposition that federal whistleblower statutes should be broadly construed. The lower court opinion in Neal, however, was not the final disposition of that case. See Neal v. Honeywell, Inc., 33 F.3d 860 (7th Cir. 1994). On appeal, the Seventh Circuit criticized the district court's broad construction language and balked at the idea that "all statutes should receive the reading most favorable to whistleblowers." Id. at 863. The court nevertheless affirmed the district court's decision that the whistleblower statute applied to the plaintiff's situation. Id. at 863-64.

the protection of the whistleblower statute. In its defense, the employer claimed that the statute applied only to situations in which an "action" under the False Claims Act was or would be filed. The Seventh Circuit construed the statute to cover the plaintiff's actions. Id. at 864. To read it otherwise, the court determined, would yield the absurd result that employees would be protected "in doubtful cases (the kind that breed litigation)," but not "when the fraud is so clear that the employer capitulates, averting litigation." Id.

The Eleventh Circuit took a similarly broad view of another federal whistleblower statute in Bechtel Constr. Co. v. Secretary of Labor, 50 F.3d 926 (11th Cir. 1995). The statute in question provided protection for any employee who "commenced, caused to be commenced," "testif[ied] in," or "assist[ed] or participat[ed] in any manner in" "a proceeding for the administration or enforcement of any requirement imposed under . . . the Atomic Energy Act." Id. at 931 (citing 42 U.S.C. § 5851(a)). The court held that informal complaints made by an employee were covered by the statute.[5] Bechtel, 50 F.3d at 932-33. In its analysis, the court stated that this interpretation "promotes the remedial purposes of the statute and avoids the unwitting consequence of preemptive retaliation, which would allow the whistleblowers to be fired or otherwise discriminated against with impunity for internal complaints before they have a chance to bring them before an appropriate agency." Id.

We agree with the district court that section 1831j(a)(2) covers Haley's actions in this case. This interpretation protects those who provide information about violations of the law to the appropriate authorities, but who try to safeguard themselves by blowing the whistle discreetly—i.e., by "requesting" with a mere suggestion or an implicit understanding. Particularly when the employee's failure to make a direct request is driven by fear of the very conduct the statute proscribes (namely, retaliation),

---

[5]The statute now expressly includes internal complaints. 42 U.S.C. § 5851(a)(1)(A).

-10-

it would be unreasonable to deny the statute's protection once the employee has completed the task the statute seeks to encourage (namely, alerting authorities to possible illegal activity). Our reading of the statute best effectuates the policy Congress sought to achieve in passing it.

### C. The "Possible Violations of Any Law" Requirement

The third point raised by Retsinas on appeal is that the Haley Memo referred only to Haley's personal disagreement with the OTS's policy regarding MCM, and not to any illegal activity of which the OTS may have been guilty. In his brief, Haley argues at length that the OTS's policy regarding MCM was a possible violation of many laws and regulations. The issue, of course, is not what arguments can be made in retrospect, but what information was conveyed in the memo itself.

In the memo, Haley stated, among other things,

> I cannot believe that Congress intended for the FIRREA legislation to be used as a pretext for removing a board of directors and management who have managed soundly and fulfilled all of their fiduciary responsibilities from an institution which is viable and poses no risk to the insurance fund. After all, this is America. The Federal government should not be permitted to take a profitable business away from anyone without a lengthy period of due process and until all reasonable alternatives are exhausted.

The language of section 1831j(a)(2) is broad. It refers to "information . . . regarding any possible violation of any law or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." After reviewing the memo, we cannot conclude that it does not contain "information regarding any possible violation of any law," or, at least, information

regarding "an abuse of authority" by the OTS. Accordingly, we find that Haley's disclosure is protected by section 1831j(a)(2).

We have reviewed Retsinas's other arguments on appeal, and we also find them to be without merit.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

RICHARD S. ARNOLD, Chief Judge, dissenting.

When Mr. Plowman gave Mr. Haley's memorandum to the FDIC, he was not, in my view, "acting pursuant to the request of" Mr. Haley, as that phrase is used in 12 U.S.C. § 1831j(a)(2). I therefore respectfully dissent.

The Court holds that this "request" element of the statute has been met. It recites the District Court's finding "that Plowman and Haley had discussed Plowman's intention to contact Congress or the FDIC about the problem." Ante, at 7 (footnote omitted). Thereafter Haley furnished the memorandum to Plowman with the request that the latter use it in any way that might be appropriate to preserve the independent existence of Marion County Mutual Loan and Building Association. From these facts, the Court infers that Haley at least implicitly requested Plowman to give the memorandum to the FDIC.

It is certainly true that Haley prepared the memorandum and gave it to Plowman. It is likewise true that Plowman turned the memorandum over to the FDIC. The further statement that Plowman and Haley had discussed Plowman's intention to contact Congress or the FDIC about the problem, however, is simply not supported in the record. With deference, I believe that the finding of the District Court to this effect was

-12-

clearly erroneous. A careful reading of the testimony of Plowman and Haley points unmistakably to this conclusion.

<u>Bayard Plowman's Testimony</u>

At trial, Mr. Plowman stated that Mr. Haley told him he was going to write a memorandum to his superiors. Mr. Plowman was asked if Mr. Haley mentioned any other individuals to whom he planned to send the memo, and at first Mr. Plowman replied, "I'm not sure." Mr. Plowman then mentioned that he was interested in discussing the situation with Congressman Henry Gonzalez, although Mr. Plowman never stated that Mr. Haley told him he planned to send the memorandum to Congressman Gonzalez. Mr. Plowman was asked again to whom Mr. Haley planned to send the memorandum. Mr. Plowman repeated that Mr. Haley was going to send it to his superiors. Then Mr. Plowman testified that he had received a handwritten letter (which he had not saved) with the memorandum from Mr. Haley. Mr. Plowman said, "Well, I can't remember [what the letter from Haley said], but it said, take this letter and do what you can to save yourself." Mr. Plowman stated that he was going to take the memorandum and see Congressman Gonzalez, but "I made a mistake and gave the letter to the FDIC examiner [Chapman]." Mr. Plowman explained that he had given the memorandum to Mr. Chapman because he viewed him as a kind of "good cop." Mr. Plowman said that he then made an appointment with Congressman Harold Volkmer, who told Mr. Plowman he would give the memorandum to Congressman Gonzalez.

On cross-examination, Mr. Plowman testified that "[Haley] said to take that note or memo and do whatever is necessary to help yourself out." He was asked, "so [Haley] did not specify for you to give that directly to the FDIC; isn't that correct?" Mr. Plowman responded, "I'm not sure of that." The follow-up question to him was, "In fact, you made the decision to give the memo to the FDIC?" Mr. Plowman answered, "I did make that decision."

-13-

This testimony is from the Joint Appendix - Volume 1 (Appendix) pages 37-47.

Michael Haley's Testimony

On direct, Mr. Haley was asked about his conversation with Mr. Plowman regarding Mr. Plowman's concerns about his ability to hold on to Marion County Mutual. Mr. Haley explained that he told Mr. Plowman he wanted to write a letter to Congressman Gonzalez on Mr. Plowman's behalf, but that Mr. Plowman discouraged Mr. Haley because it would get Mr. Haley into trouble. Mr. Gonzalez is the only name Mr. Haley stated he discussed as a potential memorandum recipient in that conversation with Mr. Plowman. Appendix 191-96.

Mr. Haley testified he wrote the memorandum anyhow. He was asked to whom he planned to send the memo. He explained that after several drafts he still was not sure to whom he would send it, but stated that "one of my drafts, I had addressed it to Senator Bond with a copy -- copies to Volkmer, Danforth, Gonzalez. . . . And also at that time I was thinking about giving copies to T. Timothy Ryan, the chairman of the OTS, and L. William Siemann [sic], chairman of the FDIC." Mr. Haley explained that he was thinking of sending it to Mr. Seidman at the FDIC because of an article he had read in the New York Times which left him with the impression that Mr. Seidman could be helpful, but eventually Mr. Haley rejected the idea. Appendix 198-200.

Mr. Haley testified that, when he called Mr. Plowman to get some numbers, he again mentioned that he was preparing the memorandum. Mr. Plowman advised Mr. Haley not to write it, and Mr. Haley just said "O.K." to Mr. Plowman, and got the information from Mr. Plowman anyhow. Mr. Haley stated that he changed direction on the substance of the memorandum at that point, and then sent it out, including the copy to Mr. Plowman. Mr. Haley was asked: "And why did you [send it to Plowman]?"

-14-

A:    Because time is of the essence.  I sent copies to the OTS.  I was going to give them a chance to do something, but it looked like time was running out and I had to get it into Plowman's hands as soon as possible.

Q:    Did you send it to him in lieu of sending it to these congressmen and other people that you thought about sending it to?

A:    Yes, I did.  . . .

Q:     And what did you tell [Plowman] in the cover letter?

A:    I said, 'Dear Bayard:  This is your copy of a memorandum I am sending to Maffit with copies to [others].  I know you told me not to do this, but I have decided to do it anyway.  I strongly urge you to use this memorandum to save the institution or to give this memorandum to anyone who you think can help you save the institution.  I think it will help separate you from all the other imperiled S & L executives seeking relief."

Appendix 204-07.

Under cross-examination, Mr. Haley admitted that he had testified differently about his instructions to Mr. Plowman before the Merit System Protection Board.  At that earlier proceeding, he had stated that he urged Mr. Plowman to give the memorandum to Congressman Gonzalez, and that that was his only purpose for providing Mr. Plowman with a copy.  Counsel asked:  "And isn't it the first time that you felt you were being terminated for giving a copy of the memo to the FDIC was after section 1831 was amended to include the FDIC in 1991?"  Mr. Haley answered, "yes."  Appendix 260-63.

On redirect, Mr. Haley's lawyer tried to undo the damage from his admission that his Merit System Protection Board testimony was different from what he told the District Court.  His lawyer asked, "and then did you think further about how you came to decide who you were going to send it to?"  Mr. Haley replied,

A.     I just remember, I think what happened was the distribution list kept growing and I just thought, this thing is getting out of control, and I know if I do this, I'm gonna get fired, so at some point, I decided this doesn't make sense to just, you know, to spray this thing around like that. I'm going. I don't know who Plowman is trying to see. Why should I be down here in St. Louis trying to guess who he wants to see. I'm just going to turn it over to Plowman and let him identify the people he wants to see.

Q:     And he did that, is that right?

A:     That's correct.

Q:     And you've never claimed in this proceeding that you told him to give it to the FDIC or anybody else in particular?

A:     No, I just gave it to him.

Appendix 270-71.

Thus, Haley never told Plowman to send the memorandum to the FDIC. He never even discussed with Plowman the possibility of sending it to the FDIC. Haley thought about the Chairman of the FDIC as a potential recipient, but never mentioned this thought to Mr. Plowman, and later changed his mind about it. I am at a loss to understand what basis there is for any finding that Plowman and Haley had discussed any contact with the FDIC.

At the oral argument in this case, Mr. Haley's lawyer was asked to identify the strongest evidence in his favor on this issue. He cited page 207 of the Appendix, where Mr. Haley recounts what he said to Mr. Plowman:

-16-

> I strongly urge you to use this memorandum to save the institution or to give this memorandum to anyone who you think can help you save the institution.

This is a "request," to be sure, but it is quite general. It does not mention the FDIC or any other specific recipient. So far as this language is concerned, Mr. Plowman could have given the memorandum to the press and still have been within the directions that Mr. Haley gave him.

The statute, to repeat, protects Mr. Haley only if Mr. Plowman was "acting pursuant to the request of" Mr. Haley when he gave the information to the FDIC. I concede that the words could be stretched to cover this case. Mr. Haley told Mr. Plowman to give the memorandum, essentially, to anyone he thought could help; Mr. Plowman thought the FDIC could help; and he gave the memorandum to the FDIC. I believe a natural reading of the statute requires a more specific connection between the action of the recipient of the memorandum and the language used by the person who wrote it. Otherwise, almost any handing over of information by an intermediary could arguably be brought within the ambit of the statute, so long as the ultimate recipient of the information was one of the named federal banking agencies.

Accordingly, I would reverse the judgment of the District Court. I fear that the action our Court takes today will unduly interfere with the authority of agencies of the federal government to run their own business.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.