[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 8, 2006
THOMAS K. KAHN
CLERK

————————————————

No. 04-16535

————————————————

D. C. Docket No. 03-02741-CV-HS-NE

RUSSELL LIPPERT,

Plaintiff-Appellant,

versus

COMMUNITY BANK, INC., a corporation,

Defendant-Appellee.

————————————————

Appeal from the United States District Court
for the Northern District of Alabama

————————————————

**(February 8, 2006)**

Before ANDERSON, BLACK and CARNES, Circuit Judges.

ANDERSON, Circuit Judge:

Russell Lippert ("Lippert" or "Plaintiff") appeals the district court's grant of summary judgment to his former employer, Community Bank. Lippert argues that Community Bank fired him in retaliation for protected whistleblowing, in violation of 12 U.S.C. § 1831j. We reverse the district court and remand for further proceedings.

## I. BACKGROUND

Patrick Frawley ("Frawley"), chairman and C.E.O. of Community Bank, hired Russell Lippert on April 14, 2003, as the Bank's Senior Vice-President and Director of Risk Management. Lippert had previously worked for Community Bank as an independent consultant. The Bank had recently hired Frawley as the leader of a new management team that was working to improve the Bank's regulatory and financial situation after several tumultuous years under the prior management. Because of these prior problems, Community Bank was operating under a cease and desist order and heightened scrutiny from regulatory authorities.

Within a few days of beginning work, Lippert sent a series of memoranda to the Bank's local presidents requesting certain loan information. A few weeks later, on or about May 14, 2003, Lippert sent another series of memoranda to Community Bank President Stacey Mann ("Mann") and Senior Lender Mark Soukup about the Bank's loan grading. On May 23, 2003, Frawley told Lippert that "we need to stop

the memo writing campaign." Lippert later acknowledged that he had a strained relationship with several members of the Bank's management.

On May 19, 2003, Lippert sent a letter to an employee at the Federal Deposit Insurance Corporation ("FDIC") and an employee of the Alabama State Banking Department, in which he complained that the Bank's management was resisting his recommendations. In particular, he criticized Community Bank's grading of delinquent loans and the level of the Bank's loss reserve. On May 25, 2003, Lippert sent a letter to the same individuals, in which he complained about the same issues. Lippert then met with an FDIC examiner during the June "visitation" at the Bank. He asserts that he discussed his concerns at that meeting.

Lippert testified that he visited Bank Director and Audit Committee member Jimmie Trotter ("Trotter") at his home on the morning of August 20, 2003, and, in the course of a two- to three-hour discussion concerning Bank matters, told him that he, Lippert, had communicated concerns about the Bank to the FDIC. Trotter disputes that Lippert ever told him about the disclosures. Frawley and the six other board members have stated that Trotter never told them about Lippert's communications with the FDIC. According to Lippert's testimony, Trotter was untroubled by Lippert's disclosures to the FDIC and Trotter revealed that he was considering discussing some of his own concerns with the FDIC and/or state

3

banking authorities.

On August 20, 2003, Lippert presented Frawley with a memorandum dated August 19 that discussed his various concerns about the Bank. Lippert and Frawley discussed this memorandum. After this discussion, Lippert created a new memorandum dated August 20, 2003. On August 21, 2003, Lippert left a copy of his August 20 memorandum in Frawley's office. Lippert then presented the same memorandum at an Audit Committee meeting that day. Lippert contends that the August 19 and August 20 memoranda were nearly identical.

After the meeting, the four members of the Audit Committee met with Frawley and Mann to ask about the issues that Lippert had raised in his memorandum. Frawley and Mann told the members of the Audit Committee about the trouble they had encountered with Lippert's refusal to communicate personally with members of Bank management, and his insistence on using written memoranda to communicate. Including Frawley and Mann, six of the eight directors of Community Bank were present during the discussion after the August 21 Audit Committee meeting. The directors who were present told Frawley that they would support whatever action he took with regard to Lippert's employment.

On Friday, August 22, 2003, and Monday, August 25, 2003, Lippert met with the FDIC audit team that was on-site at the Bank. Lippert was the Bank's

4

point man in dealings with the FDIC auditors while they were preparing for their examination, which was to take place in September. Lippert asserts that he discussed with the FDIC examiners the same concerns that he raised in his August 19/20 memorandum.

Meanwhile, on Friday, August 22, 2003, Frawley gave notice for a special Board of Directors meeting to be held on Monday, August 25, 2003. Under the Board's operating rules, Frawley was required to give at least 24-hour notice of a special meeting of the Board of Directors. On Monday, August 25, 2003, seven members of the Board of Directors unanimously approved a motion to give Frawley authority to take whatever action he deemed appropriate regarding Lippert's employment, including termination. Frawley consulted the eighth director after the meeting, and that director agreed with the authority given to Frawley. On Tuesday, August 26, 2003, Frawley terminated Lippert. The next day Ron Mitchell from the FDIC called Frawley and expressed concern over Lippert's termination.

On October 6, 2003, Lippert filed an action against Community Bank, alleging that he was fired in retaliation for his whistleblowing revelations to the FDIC in violation of 12 U.S.C. § 1831(j).[1] On August 2, 2004, Community Bank

---

[1]  Lippert's other claims were also rejected by the district court. However, Lippert does not challenge those rulings on appeal.

filed a motion for summary judgment. On September 10, 2004, the district court

denied the motion. On September 15, 2004, Community Bank filed a motion for

reconsideration. On October 26, 2004, the district court granted Community

Bank's motion, vacated its prior opinion, and entered judgment against Lippert on

all counts. In ruling against Lippert on the whistleblower claim now challenged on

appeal, the district court held that Lippert's internal reports to the Bank's Audit

Committee and Board of Directors were not protected disclosures under the statute,

even though Frawley and the Board knew that such reports would inevitably come

to the attention of the FDIC in its audits. The district court also held that, although

Lippert did make protected disclosures directly to the FDIC,[2] Lippert failed to

demonstrate a genuine issue of material fact that either Frawley or the Board of

Directors had knowledge that Lippert was thus communicating with the FDIC, and

without such knowledge, the court concluded that Lippert's protected conduct

could not have been a contributing factor in the decision to terminate Lippert.

Lippert now appeals the district court's decision granting summary judgment

in favor of the Bank on his §1831(j) whistleblower claim. Contrary to the district

court, and on the basis of the totality of the evidence adduced in this summary

---

[2]    For purposes of the summary judgment proceedings, Community Bank conceded that the disclosures made by Lippert directly to the FDIC are protected under the applicable whistleblower act.

judgment record, we conclude that a reasonable jury could find that the decision-maker[3] did know of Lippert's communications directly with the FDIC; thus, we reverse. Before discussing that evidence, however, we first set out our standard of review in Part II, the applicable law in Part III.A, the significance of Lippert's internal reports in Part III.B, and finally we discuss the evidence in Part III.C.

## II. STANDARD OF REVIEW

This Court reviews <u>de novo</u> the grant of a motion for summary judgment. <u>Rojas v. Florida</u>, 285 F.3d 1339, 1341 (11th Cir. 2002). Our discussion of Lippert's internal reports involves a question of statutory construction, which is reviewed <u>de novo</u>. <u>United States v. Frye</u>, 402 F.3d 1123, 1126 (11th Cir. 2005). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

---

[3] In this opinion, we use the term "decision-maker" as a term of art. We do not distinguish between Frawley and the Board of Directors in referring to the decision-maker. This is because a reasonable jury could conclude that all of the knowledge referred to in this opinion was possessed at least by Frawley, and also that the Board had specifically authorized Frawley to terminate Plaintiff. Thus, without regard to the precise knowledge communicated by Frawley to the Board members or otherwise possessed by them, Frawley "at the very least . . . was the Board's agent, acting on its behalf" to terminate Plaintiff. District Court Order, Doc. 69 at 9.

# III. DISCUSSION

## A. Applicable Law

Lippert alleges that Community Bank fired him in retaliation for "whistleblowing" in violation of 12 U.S.C. § 1831j(a)(1). This statute provides:

> No insured depository institution may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request of the employee) provided information to any Federal banking agency or to the Attorney General regarding –
>
> (A) a possible violation of any law or regulation; or
>
> (B) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety;
>
> by the depository institution or any director, officer, or employee of the institution.

12 U.S.C. § 1831j(a)(1). The statute is part of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), as amended by the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA").

Section 1831j adopted the legal burdens of proof from the Whistleblower Protection Act ("WPA"), 5 U.S.C. § 1221(e)(1). 12 U.S.C. 1831j(f). Under this Act, an employee must prove that his protected disclosure was "a contributing

factor" in the adverse personnel action. 5 U.S.C. § 1221(e)(1). According to the

WPA:

> The employee may demonstrate that the disclosure was a contributing factor in the personnel action through circumstantial evidence, such as evidence that –
>
>> (A) the official taking the personnel action knew of the disclosure; and
>>
>> (B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action.

5 U.S.C. § 1221(e)(1).

Once a plaintiff makes out a prima facie case of retaliation under § 1831j, the defendant must articulate, by clear and convincing evidence, a legitimate, non-discriminatory reason for the termination. In this case, the parties dispute whether Lippert has successfully made out a prima facie case of retaliation. Community Bank concedes that "temporal proximity" is present, but argues that Lippert cannot prove that the decision-maker at Community Bank had knowledge of his protected activity. In this opinion, we address proof of such knowledge in two distinct ways. First, Lippert asserts that his internal reports to Community Bank's Audit Committee, of which Frawley and the Board were aware, were protected disclosures. Second, he argues that a reasonable inference can be drawn from the

9

totality of the evidence that the decision-maker knew of his protected communications directly with the FDIC.

B. Lippert's Internal Reports

Lippert argues that the reports he made to the Audit Committee and the Board of Directors are protected under § 1831j because the FDIC eventually would review these reports, especially considering that Community Bank was under close scrutiny by the FDIC. Frawley knew, or should have known, that the FDIC would review these reports in the course of their examinations. Therefore, Lippert insists, Frawley and the Board knew of protected disclosures and a jury could find that Lippert's termination was in retaliation for these disclosures.

Section 1831j(a)(1) protects an employee who discloses wrongdoing to "any Federal banking agency or to the Attorney General." The plain language of the statute sets out the particular recipients of the employee's disclosure, in order for the employee be protected from retaliation. This interpretation is bolstered when the language of § 1831j(a)(1) is contrasted with the more expansive language of § 1831j(a)(2), which governs disclosures by employees of federal banking agencies, federal home loan banks, and federal reserve banks. Section 1831j(a)(2) protects disclosures by such federal employees to "any such agency or *bank* or to the Attorney General." (Emphasis added). By contrast, Section 1831j(a)(1), governing

10

disclosures by other bank employees, does not include the same protection for disclosures to banks. "[I]t is generally presumed that Congress acts intentionally and purposely where it includes particular language in one section of a statute but omits it in another." Bledsoe v. Palm Beach County Soil & Water Conservation Dist., 133 F.3d 816, 824 (11th Cir. 1998) (internal quotation omitted). Congress appears to have made a conscious decision to protect employees of federal banking agencies (including federal home loan banks and federal reserve banks) who disclose information to banks, but not to protect other bank employees who disclose information to banks. Moreover, granting protected status to bank employees who complain internally poses increased risks of interfering with normal workplace relations within a bank and substantially expands the notion of "whistleblowing," beyond that apparently contemplated by the instant statute.

The sparse case law from other Circuits supports our analysis. In Taylor v. FDIC, 132 F.3d 753 (D.C. Cir. 1997), the D.C. Circuit considered the Resolution Trust Corporation Whistleblower Act ("RTC Whistleblower Act"). The RTC Whistleblower Act's anti-retaliation provision is very similar to § 1831j(a)(1). The RTC Whistleblower Act required a whistleblower to disclose information to the RTC, the Thrift Depositor Protection Oversight Board, the Attorney General, or any Federal banking agency. In Taylor, the RTC employees communicated their

11

concerns to the GAO and testified before the Senate Banking Committee. Neither was a recipient designated in the statute. The RTC launched its own investigation based on these reports. Id. at 759. Although the RTC was a designated recipient, the D.C. Circuit held that the disclosures were not protected, because they drifted to the RTC only by "happenstance." Id. at 763. The disclosures were not made to a statutorily-covered recipient "in the first instance" but, rather, reached those recipients indirectly. The employees argued that it should make no difference whether they provided the information directly or indirectly. The court held that "[i]t seems reasonable that Congress would afford special protection for communications directed to the specified entities, all ones with a capacity to remedy wrongs brought to their attention, and would withhold the protection from communications that only drift into such hands by happenstance." Id.

We believe that the internal reports in the instant case are more remote from the whistleblowing contemplated by the statutory language than were the communications in Taylor. Such internal reports partake much less clearly of the characteristics of whistleblowing. Congress may well have had some reluctance to interfere with, and potentially chill, such internal self-criticism. We conclude that the language of the instant statute does not protect Lippert's internal reports to the

Audit Committee, management, and Board of Directors.[4]

Accordingly, we hold that Lippert's internal reports are not protected disclosures under § 1831j(a)(1), and the district court did not err in so ruling.[5]

## C. Evidence of the Decision-Maker's Knowledge

As noted above, the district court concluded that Lippert had failed to demonstrate a genuine issue of material fact that the decision-maker knew that Lippert was making disclosures to the FDIC. We conclude that this appeal turns upon the answer to a single question: whether or not there are reasonable inferences from the evidence such that a reasonable jury could conclude that the decision-maker knew that Plaintiff was making disclosures to the FDIC. After

---

[4]Haley v. Retsinas, 138 F.3d 1245 (8th Cir. 1998), which interprets § 1831j(a)(2), is not inconsistent with our ruling. It did not involve internal reports or communications; rather the plaintiff-bank examiner there communicated to the manager of a thrift institution which was subject to regulation by the bank examiner and his employer, the Office of Thrift Supervision. The bank examiner disclosed information in a memo to the thrift institution's managing officer and told him to use it as necessary to save the institution, contemplating the FDIC as a potential recipient. The managing officer took the memo to the FDIC, which was a designated recipient under the statute. The Eighth Circuit held that the bank examiner had made a protected disclosure even though the information reached the FDIC through an intermediary. Section 1831j prohibits retaliation against an employee "because the employee (or any person acting pursuant to the request of any employee) provided information to any such agency . . . ." The Eighth Circuit determined that the intermediary acted "pursuant to the request of" the bank examiner. Lippert's disclosures did not reach the FDIC through any "person" acting pursuant to Lippert's request. Even if Lippert intended that the FDIC would see the reports he submitted to the Audit Committee, his passive behavior does not fit well within the statutory language of § 1831j(a)(1).

[5]The parties mention various cases involving other whistleblower statutes. At first glance, some such cases would seem inconsistent with our decision, until one realizes that they involve very different statutes, which do not designate particular recipients for the protected disclosures.

careful consideration of the evidence reflected in this summary judgment record, we conclude that there are genuine issues of fact in that regard. The following evidence leads us to that conclusion.

The decision-maker knew that Plaintiff was suggesting significant changes in several of the Bank's procedures (e.g., improvements in the loan grading procedures and increases in the loss reserves). The decision-maker knew that such changes related to matters which would obviously be matters of particular interest to the FDIC in view of the recent tumultuous years experienced by the Bank, which had prompted the extant cease and desist order and the current close scrutiny by FDIC. These problems had also prompted employment of the Bank's new management team. The new team was charged to work closely with state and federal regulators and restore the institution to a sound financial and regulatory footing. Both Lippert and Frawley were a part of the new team. Indeed, the decision-maker knew that Plaintiff occupied the position of Senior Vice-president and Director of Risk Management, and was the Bank's point man in dealing with the FDIC during its visit in June 2003 and its August 2003 visit in preparation for an examination to occur in September 2003. There is even some evidence that the FDIC perceived that Lippert was performing an independent function within the Bank.

The decision-maker was aware of the suggestions or constructive criticism memorialized in Lippert's several memoranda addressed to the Bank's local presidents and senior management during the relevant time period; the decision-maker was also aware that Plaintiff perceived resistance from some in the management to his efforts. Thus, the decision-maker was aware of the content of Plaintiff's recommendations to senior management contained in his memoranda in April and May, 2003. The decision-maker also knew that Lippert met with an FDIC examiner during the latter's visit to the Bank in June 2003. The decision-maker was also aware of Plaintiff's August 19, 2003, memorandum to senior management, the contents of which Plaintiff and Frawley discussed in their meeting on August 20. The decision-maker was also aware of a revised memo dated August 20, 2003, which Plaintiff left at the Frawley's office on August 21. That memo was also discussed that same day when Lippert met with the Bank's Audit Committee. Finally, the jury could find that the decision-maker knew that the FDIC audit team was in the Bank and met with Lippert on August 22 and August 25, in preparation for the imminent FDIC audit.

A reasonable jury could find from the foregoing facts that by the time the decision was made in August to terminate Plaintiff, the decision-maker knew that Plaintiff had communicated to the FDIC the recommendations he was

15

simultaneously proposing to the Bank's senior management.  This inference is bolstered by several additional factors.  There is little or no evidence in the record to suggest that Lippert was acting outside of the authority of his position in revealing to the FDIC his recommendations to the Bank.  Indeed, there is evidence that at least one director of the Bank, Trotter, expressly knew of Plaintiff's communications to the FDIC and perceived such action as entirely appropriate. And, as noted above, Lippert was the Bank's point man for dealing with the regulators during their on-site visits in June and August. Following those visitations in June and August, the FDIC met with Frawley the same day and almost immediately after their meeting with Plaintiff. Frawley acknowledged that during this period the FDIC discussed with him concerns relating to loan loss reserves and improving the quality of assets, some of the same issues about which Plaintiff had been concerned and had urged the Bank to address. From the deposition testimony of Plaintiff and Frawley in this regard, a reasonable jury could conclude that these same issues were discussed with Frawley in his exit interviews with the FDIC during the June and August visitations. Also bolstering the inference that the decision-maker knew that Lippert had been communicating his concerns to the FDIC is the fact that the Bank's articulated reason for firing Plaintiff – Plaintiff's propensity to communicate with senior management by memoranda,

16

rather than oral, more personal means – carries with it an inference adverse to the Bank. Lippert's memoranda, being in written form, would obviously and readily come to the attention of FDIC auditors who were closely scrutinizing the Bank and would surely see the memoranda in the course of their audit which was expected imminently. Thus, the Bank's stated reason carries with it some inference that the Bank was trying to avoid regulatory scrutiny. This inference is bolstered by Lippert's deposition testimony. Adding to that inference is the fact that there was no adverse criticism of Plaintiff's job performance in his personnel file.

On the basis of the totality of the circumstances here, and assuming all reasonable inferences in favor of Plaintiff (as we must in this summary judgment posture), we conclude that there are genuine issues of fact on the basis of which a reasonable jury could conclude that the decision-maker knew that Lippert was communicating information to the FDIC. The district court's contrary conclusion, which relied on the self-serving testimony of the decision-maker, was error. In light of the countervailing evidence, a reasonable jury could discount such testimony.

Having concluded that there are genuine issues of fact for a jury with respect to the decision-maker's knowledge of Lippert's disclosure of protected

information,[6] we conclude that the district court's grant of summary judgment in favor of the Bank must be reversed. In other words, the district court granted summary judgment because it believed the Bank had no knowledge of the protected disclosure. The district court erred in failing to recognize the genuine issue of material fact in that regard, and thus its summary judgment on that ground cannot stand.[7]

---

[6] We recognize that the Bank may have conceded the protected nature of the disclosures only for purposes of summary judgment. We express no opinion on that issue, but leave the matter to the district court on remand.

[7] Our decision is not inconsistent with Brungart v. Bellsouth Telecommunications, Inc., 231 F.3d 791 (11th Cir. 2000), or Clover v. Total Systems, Inc., 176 F.3d 1346 (11th Cir. 1999). Both of those cases also involve the issue of whether there were reasonable inferences on the basis of which the fact finder could find that the decision maker knew that plaintiff had engaged in the protected conduct. Both cases also involved testimony by the decision maker disavowing such knowledge. However, each case is distinguishable from this case. In Brungart, plaintiff was a service representative whose job was to answer calls from customers. Bellsouth measured the amount of time such employees are actually available to take calls compared to their scheduled time, called their adherence percentage. Plaintiff had experienced considerable attendance problems, having repeatedly failed to attain the proscribed adherence percentage. Plaintiff had already reached the penultimate step (before termination as the last step) of Bellsouth's progressive disciplinary process, having already been suspended twice during 1997. Plaintiff was terminated on July 9, 1997, by Nelson who had just assumed his new position as top tier manager in early July, and who oversaw plaintiff's immediate supervisor. Unbeknownst to Nelson, plaintiff had earlier applied for FMLA leave which was granted by a different Bellsouth official, the FMLA administrator, and which was scheduled to begin on July 10, 1997, which happened to be the day after Nelson terminated plaintiff on July 9. Nelson testified that he had no knowledge of her scheduled FMLA leave, and we concluded that "there is no evidence to contradict his testimony. Id. at 794. We held that "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection when there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." Id. at 799.
Similarly, in Clover, we held that there was insufficient evidence that the decision-maker was aware of the plaintiff's protected conduct. In Clover, the plaintiff was often tardy and had been threatened with probation in the past for that reason. On March 23, 1995, plaintiff was

18

Accordingly, the summary judgment in favor of the Bank is reversed and the

case is remanded for further proceedings not inconsistent with this opinion.

**REVERSED and REMANDED**.

---

asked to meet Human Resources official, Hollingsworth, across town from the office occupied by plaintiff and her supervisors. It turned out that Human Resources wanted to question plaintiff as part of their confidential internal investigation triggered by an EEOC charge filed by a former co-worker of plaintiff against Pettis, who supervised the immediate supervisor of plaintiff and the co-worker. Plaintiff was late to the meeting with HR, and then failed to promptly return to her own office after the conclusion of her meeting with HR. Plaintiff's immediate supervisor arranged a meeting with Pettis to discuss plaintiff's tardiness, a meeting that the next level supervisor, Miller, attended at plaintiff's request. Plaintiff admitted at that meeting that she had been late to the meeting with Human Resources. However, she gave an explanation therefor which conflicted with the reason she had given to Human Resources at the time. Miller, the decision-maker in the case, informed plaintiff the next day that he was terminating her because she had given conflicting explanations for her tardiness, indicating that he had learned from Hollingsworth that she had given a conflicting reason to him. Miller gave unequivocal testimony denying that he was aware of plaintiff's protected conduct, her participation in the investigation of the EEOC charge. Plaintiff in Clover attempted to impeach Miller's testimony by adducing evidence that Miller was a friend of Pettis and his supervisor, that Miller knew that there had been an investigation of Pettis about something (without knowledge of the details), and that Miller had spoken with Hollingsworth at some time after plaintiff's meeting with Hollingsworth, but before he made his termination decision. We concluded that the foregoing evidence was insufficient for a reasonable jury to infer that Hollingsworth had told Miller that plaintiff had participated in the investigation of Pettis. In Clover, we expressly distinguished another case in which a decision maker's disavowal of knowledge was sufficiently impeached to create an issue of fact for the jury. We concluded that plaintiff "offered no evidence to impeach Miller's unequivocal denial that he had any knowledge of Clover's participation in the Pettis investigation or that he had ever discussed the subject with Hollingsworth." Id. at 1355.

In this case, there is substantially more evidence than in Brungart or Clover which a reasonable jury could view as tending to impeach the decision-maker's disavowal of knowledge. We conclude in this case that there is a genuine issue of material fact in this regard, and a genuine issue of material fact with respect to whether the decision-maker did know that Lippert was making protected disclosures to the FDIC.

19