[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 7, 2007
THOMAS K. KAHN
CLERK

No. 06-15417
Non-Argument Calendar

_____

D. C. Docket No. 05-00817-CV-T-24-MSS

KAREN CARLSON,

Plaintiff-Appellant,

versus

LIBERTY MUTUAL INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(June 7, 2007)**

Before DUBINA, BLACK and CARNES, Circuit Judges.

PER CURIAM:

Karen Carlson appeals the district court's grant of summary judgment to her

employer, Liberty Mutual Insurance Company, in her lawsuit alleging disability and gender discrimination filed pursuant to the Florida Civil Rights Act (FCRA), Fla. Stat. § 760.01-760.11.[1]  We affirm the district court.

## I.  STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*.  *Lippert v. Cmty. Bank, Inc.*, 438 F.3d 1275, 1278 (11th Cir. 2006).  Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *Id.*

## II.  DISCUSSION

In a discrimination case, the complainant carries the initial burden of establishing a *prima facie* case of discrimination.  *McDonnell Douglas Corp. v. Green*, 93 S. Ct. 1817, 1824 (1973).  The burden then shifts to the employer to offer a "legitimate, nondiscriminatory reason" for its decision.  *Id.*  If it does so, the burden shifts back to the complainant to show the employer's proffered reason was

---

[1]  Carlson, a female who suffers from epilepsy, filed a complaint in Florida state court alleging she was disabled and that Liberty Mutual failed to make a reasonable accommodation for her disability by refusing her request to work from home in her position as a regional medical director (RMD) while she was under a driving ban as a result of her epilepsy.  Liberty Mutual subsequently had the case removed to the United States District Court for the Middle District of Florida on the basis of diversity jurisdiction.  Carlson then filed an amended complaint adding a claim for gender discrimination under the FCRA alleging that gender was a factor in her termination.

2

pretextual. *Id.* at 1825. The burden-shifting analysis also applies to claims under the ADA. *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001).

A. *Disability discrimination*

A disability discrimination claim brought under the FCRA is analyzed under the same framework as ADA claims. *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1224 n.2 (11th Cir. 2005). To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show (1) she has a disability, (2) she is a qualified individual, and (3) the defendant unlawfully discriminated against her because of the disability. *Id.* at 1226.

1. *Whether Carlson has a disability*

Under the ADA, a person has a disability if she has "(A) a physical or mental impairment that substantially limits one or more of the major life activities (MLAs) of such individual; (B) a record of such impairment; or (C) [been] regarded as having such an impairment." 42 U.S.C. § 12102(2). MLAs are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Driving is not a major life activity and the inability to drive does not, by itself, substantially limit one's ability to work where she has produced no evidence that

3

she was unable to perform her job. *Chenoweth v. Hillsborough County*, 250 F.3d 1328, 1330 (11th Cir. 2001). With respect to working:

> substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i).

Carlson testified only that she was unable to drive for six months after her seizure. She specifically testified that as long as she took her medication, her ability to work was not limited. *See Sutton v. United Air Lines, Inc.*, 119 S. Ct. 2146 (1999) (stating any measures a person takes to correct for an impairment must be taken into account when judging whether that person is substantially limited in an MLA). Carlson also stated she initially requested Liberty Mutual pay for her to take a taxi to the office, further confirming her ability to work was not limited by anything other than her inability to drive. Furthermore, although she contends she is unable to perform certain jobs, she has not presented any evidence she is prevented from performing a "class of jobs" or a "broad range of jobs." Carlson stated in her affidavit that she was unable to do anything during her seizures, which last one to three minutes. The seizures, however, are of short duration, and Carlson has experienced "very few" of them in her lifetime.

4

Moreover, Carlson presents no argument or evidence as to how her memory loss and difficulty communicating substantially limit any of her MLAs. Finally, Dr. Ramsey testified that, after her seizures, Carlson was restricted from certain activities such as bungee jumping, SCUBA diving, piloting a plane, working in elevated places, or swimming alone. These activities, however are not "major" activities comparable to walking, speaking, breathing, and learning. *See* 29 C.F.R. § 1630.2(i). Carlson did not submit any evidence from which a reasonable factfinder could conclude she was substantially impaired in her ability to work or perform any other MLAS, and the district court did not err in concluding Carlson did not meet the definition of having an actual disability.[2]

2. *Whether Carlson was a qualified individual*

A qualified individual is one who, "with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m). "Determining whether a particular job duty is an essential function involves a factual inquiry to be conducted on a case-by-case basis." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1258 (11th Cir. 2001). In certain situations, daily attendance may be an essential function of a position, however, it is not always an

---

[2] Although Carlson presented the argument she was regarded as having a disability, the district court declined to consider that issue based on its other findings. Similarly, because we conclude Carlson was not a qualified individual because she was unable to perform an essential job function, we also decline to consider whether Carlson was regarded as having a disability.

5

essential function.  *See Jackson v. Veterans Admin.*, 22 F.3d 277, 279 (11th Cir. 1994).

There was evidence Liberty Mutual regarded daily attendance at the Tampa office as an essential job function because the position required interaction with nurse case managers and claims adjusters.  Dr. David Dietz, Carlson's supervisor, testified that prior to hiring Carlson, he "recreated" the RMD role to require:

> [being] intimately involved in claims operations, develop[ing] working relationships with nurses and claims adjusters, [having] assigned offices that they were expected to provide clinical input to and assum[ing] roles that were more expansive in terms of training, development and medical policy, involvement in sales and marketing occasionally and some other things.

Also, Dietz testified he felt it was important for the RMDs to be perceived as team members, and accessibility was important for that perception.

Furthermore, Carlson testified part of her duties involved being available to the nurse claims managers and claims adjusters.  She participated in weekly meetings and held weekly office hours.  Although she did not think 40 hours a week in the Tampa office was necessary, Carlson acknowledged that, as a leader, she needed to interact with the nurses and adjusters.  Finally, with regard to others employed in similar positions, Carlson's replacement testified he spent approximately 25 to 30% of his time face-to-face with adjusters and nurses.

Although the written job description did not contain a specific number of hours, it supports that Carlson was expected to be in the office as part of her job. For example, it specifically stated Carlson was to provide "on-site" support. Also, it included job duties, such as consultation, advising nurses, and providing training, which would generally be performed from an office. Furthermore, the job description rated "good ability to work in a team/organization" and positive recommendations regarding interaction with others as highly important qualifications for the job, which suggests being around others was essential.

On the other hand, although Dietz expressed he had a preference that Carlson's replacement work from the Tampa office, Dietz testified working from the Jacksonville office was an option. Furthermore, Carlson testified while she was employed as an RMD, 95% of her job was performed by phone or internet. After her seizure, Carlson performed some of her job duties from home for approximately two and a half months, apparently without a change in her case load. Also, Carlson's replacement testified she did not leave behind "messes" as a result of working from home.

Although there may be a genuine issue of material fact as to whether Carlson's full-time presence was essential, the evidence establishes that some presence in the office was an essential function of the position. Carlson, however,

requested to work from home full time.  The evidence establishes Carlson was unable to perform the essential job function of at least some presence in the office.

Carlson fails to establish a *prima facie* case because she does not have an actual disability as defined by the ADA, and even if she was regarded as disabled, she cannot show she was qualified.  Thus, we affirm the district court's grant of summary judgment on this issue.

B. *Gender discrimination*

Gender discrimination claims under the FCRA are analyzed under the same standards as claims under Title VII.  *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998).  In the absence of direct evidence, a plaintiff establishes a *prima facie* case of discrimination by showing:  (1) she belongs to a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job.  *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  If the plaintiff establishes a *prima facie* case, the employer must offer a legitimate, nondiscriminatory reason for its decision. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089-90 (11th Cir. 2004).  The plaintiff must then establish the proffered reason is pretextual.  *Id.* at 1090.  In establishing pretext, a plaintiff must show the reason was false and discrimination

was the true reason. *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Wilson*, 376 F.3d at 1088.

Even if Carlson had established a *prima facie* case, she has not overcome Liberty Mutual's legitimate, nondiscriminatory reason for her termination, her refusal to come into the Tampa office. Although Carlson introduced evidence she could perform some of her duties from home, there was also evidence her presence in the Tampa office was needed. Therefore, none of Carlson's evidence establishes Libery Mutual's proffered reason for firing her was false.

Furthermore, viewed in the light most favorable to Carlson, Dietz's question about whether she could work with female nurses and his failure to interview or hire a female replacement do not establish he fired Carlson because of her gender. Similarly, Carlson presented no evidence that Dietz's being "chummy" with the male RMDs and her feeling like she did not receive certain information were because she was female. Although Dietz may have asked a gender-related question, there is no evidence he made comments displaying discriminatory animus against women. None of Carlson's evidence establishes the proffered reason was false, or the real reason was her gender. Accordingly, the district court

9

did not err in granting summary judgment to Liberty Mutual on Carlson's gender discrimination claim.

**AFFIRMED**.