**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0099n.06
Filed: February 6, 2009

**No. 07-3907/07-3908**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| GREGG HILL, | ) | |
| | ) | |
|     Plaintiff-Appellant, | ) | |
|     Cross-Appellee, | ) | |
| | ) | |
| v. | ) | On Appeal from the United |
| | ) | States District Court for the |
| MR. MONEY FINANCE COMPANY & FIRST | ) | Northern District of Ohio |
| CITIZENS BANC CORPORATION, | ) | |
| | ) | |
|     Defendants-Appellees, | ) | |
|     Cross-Appellants. | ) | |

**Before:**    BOGGS, Chief Judge; and GIBBONS and GRIFFIN, Circuit Judges.

**BOGGS, Chief Judge**.   Gregg Hill sued First Citizens Banc Corp. and Mr. Money Finance Co. ("First Citizens" and "Mr. Money"; collectively, "Defendants") for retaliation and wrongful termination, in violation of Ohio and federal whistleblower laws, and Ohio public policy. Defendants counterclaimed, seeking sanctions, alleging frivolous conduct by Hill under Ohio Civ. R. 11, Ohio Rev. Code §2323.51 and Fed. R. Civ. P. 11. The district court granted Defendants' motion for summary judgment on the substantive claims and then granted Hill's motion for judgment on the pleadings as to the sanctions. Both parties appeal the district court's rulings. We affirm the district court's grant of both motions.

**I**

**A. Factual Background**

First Citizens, a bank holding company, organized Mr. Money as a finance company in 2000. At the time, the Chief Executive Officer ("CEO") of First Citizens was David Voight, the Executive Vice President was Jim Miller, the human resources director was Michael Powell, the compliance officer was Vicky Doski, and its outside counsel was Jim McGookey. Mr. Money was a subprime lender, providing loans to customers who presented unusual credit risks and would normally not qualify for bank loans. In April 2000, First Citizens hired Arthur Pucci to serve as President and Chief Operating Officer ("COO") of Mr. Money. Hill was hired as senior vice president in April 2000 by Mr. Money. Defendants allege that Pucci and Hill set up a "bonus scheme," whereby a bonus attached to all loans, irrespective of their quality. Hill testifies that he did "not set loan policy, nor put a 'bonus scheme' in place." Hill received a base annual salary of $57,500; he lived in Brunswick, Ohio and drove ninety miles to the Sandusky, Ohio office of Mr. Money three days a week, per the terms of employment set by Pucci. Hill also received a car allowance of six hundred dollars per month, a benefit he did not report as income, in addition to a mileage allowance.

On or about December 5, 2001, Hill met with James Nabors, a member of Mr. Money's Board of Directors, and presented Nabors with information evidencing misconduct by Pucci. The alleged misconduct included: improper use of the company credit card for over $40,000 in charges including flowers, Victoria's Secret lingerie, and jewelry; an improper loan in the amount of $3,500 to a person who had an Ohio address, even though the loan documents were sent to a New Jersey

address; a trip expensed to Mr. Money to attend a predatory-lending seminar in Florida accompanied by a young female employee; and a note loan in the amount of $6,500 to a singer who was hired for the Mr. Money Christmas party, which was based on an overstatement of claimed income. Hill gave Nabors a 54-page document substantiating the alleged misconduct by Pucci. Nabors relayed the information to CEO Voight in a three-page letter detailing Pucci's violations, with the 54 pages provided to him by Hill enclosed; Voight then passed on the three-page letter with the enclosures to outside counsel McGookey. McGookey investigated the allegations and presented his findings to Mr. Money's Board of Directors on December 17, 2001. Pucci was then given, and accepted, the opportunity to resign. Hill alleges that Mr. Money did not report Pucci's conduct to any federal authorities, and that Pucci was allowed to resign to avoid "waves during this merger," referring to a merger that was agreed to, as Defendants show, a month and a half prior to Pucci's termination.

On or about the same day as Pucci's resignation (December 17, 2001), Voight asked Nabors to take over Pucci's duties as a consultant, initially for a six-month period; Bruce Bravard was acting president for some or all of that period. Within three weeks of assuming duties, Nabors replaced the bonus structure, required all employees including Hill to work at the Sandusky office every day, and replaced Hill's car allowance with a reportable-income raise of the same monthly amount ($600). Defendants state, and Hill does not disagree, that Hill complained to Nabors about the changes in his terms of employment. Hill was unhappy with his new employment situation, wanted a higher salary, did not want to work in the Sandusky office five days a week, and thought that Mr. Money reneged on a prior promise to set up an office in Cleveland by 2002 or 2003. In response to Hill's dissatisfaction, Nabors sought to connect Hill with other potential employers. In his deposition, Hill

indicated that throughout January, February and March, Nabors continuously referred Hill to four or five "growing" companies, which would afford Hill the opportunity to earn a higher salary; on at least two occasions, Hill was contacted or approached directly by company representatives interested in potentially hiring Hill.

On February 13, 2002, Hill attended a mandatory "Lunch and Learn" seminar given by First Citizens and led by Doski, at which he learned about the Suspicious Activity Report ("SAR") process. Hill learned that in some instances, such as insider abuse of any amount, or falsified information on a loan, an SAR must be filed with the appropriate federal law enforcement agency[1] and the Department of the Treasury. Hill alleges that he informed Nabors during early March that Pucci's conduct triggered SAR reporting obligations. Nabors recalls only a question about an SAR, and not knowing what it was. Hill alleges that he asked Nabors two weeks later whether he had looked into filing an SAR, and Nabors responded in the negative.

Defendants allege that in late February and/or early March, Nabors decided to eliminate Hill's position of senior vice president, as part of a restructuring plan for Mr. Money; they also allege that around March 10 Nabors informed Hill that Nabors was asked to assume the position of President of Mr. Money, effective March 18.

On April 5, 2002, Hill sent a letter to Mr. Money's Board of Directors and to Doski. The letter recalled Hill's December 5, 2001 complaint to Nabors about Pucci's misconduct, stated that Pucci "had improperly, and I believe unlawfully, misused Mr. Money funds, violated state and

---

[1]The record is inconsistent with regard to which federal agency is appropriate: both the Federal Reserve and the Federal Trade Commission appear in the record.

federal banking regulations, other state and federal laws and regulations, and violated the 'Code of Conduct,'" specifically listing several Ohio, New Jersey, and federal laws, and characterizing Pucci's actions as constituting insider abuse and other felonies. Hill noted that "failure to report these violations is itself a violation," and stated his intention to file an SAR, if he is not informed that an SAR has been filed by someone else.

Voight, acting-president Bravard, and Doski all forwarded Hill's letter to McGookey. On April 15, McGookey responded to Hill in a letter, informing him that federal law does not allow disclosure as to whether an SAR has been filed; that Hill's approach to the situation created "disturbing problems"; that Mr. Money has no problem with filing an SAR because it has no reason to protect the resigned Pucci; and that if Hill wanted to file an SAR, he should "go ahead." McGookey also expressed displeasure at Hill's choosing to ignore "the chain of command," and suggested that Hill "manufactured this issue for reasons that have nothing to do with" filing a SAR.

McGookey also advised Doski to seek clarification from the Financial Crimes Enforcement Network ("FinCEN"), a division of the Treasury Department, whether an SAR needed to be filed. Doski contacted FinCEN and inquired about the only allegation made by Hill that she believed was a crime – closing a loan with a person with an Ohio address but sending the documents to New Jersey. FinCEN informed Doski that they did not think it was a crime that required an SAR; on April 12, Doski also sent an email to the Federal Reserve about the same loan, and the Federal Reserve confirmed that no SAR was required.

On April 16, Nabors, Bravard, and Powell held a meeting with Hill and informed him that his position was being eliminated effective immediately, because it "could not be justified based on

the direction of the business as well as [Hill's] desire to receive compensation of 100,000 a year .

. . ." After the meeting, Hill gave Powell a copy of a letter he mailed the day before, in which Hill

detailed what he thought were retaliatory measures by Mr. Money, including the elimination of his

car allowance and the obligation to commute to Sandusky every weekday. At some date the week

prior to the meeting, Powell recorded notes on the basis of a phone conversation with McGookey

regarding the decision to terminate Hill on April 16th. Powell's notes identify Hill's disappointed

hope to become Pucci's successor, Hill's unhappiness at having to work at Sandusky five days a

week, Hill's expressed desire to Nabors that he needed a job earning $100,000 a year, and Hill's

April 5 letter to the Board of Directors that did not "follow[] the appropriate 'chain of command'."

The note concludes with what Hill alleges is evidence of retaliatory discharge: "While this last

incident was not appropriate, it is a continuation of unacceptable conduct by Gregg. In looking at

the performance of Brian Bennis and Gregg Hill, it has been determined by Jim Nabors that he

cannot continue to keep both employed and his decision is to terminate Gregg's services." On or

about June 18, 2002 – after his termination and the filing of the first suit in this dispute – Hill filed

an SAR with the Federal Trade Commission.

**B. Procedural Background**

Hill filed his first complaint against Defendants in the Common Pleas Court of Cuyahoga

County on June 14, 2002. That case was transferred to the Erie County Common Pleas Court. Hill

then commenced this action in the United States District Court for the Northern District of Ohio,

Eastern Division, before Judge Donald Nugent, which was dismissed without prejudice. After Hill

took a voluntary dismissal of the Erie County Common Pleas Court action, he refiled in the Northern

District of Ohio, Western Division. Hill's complaint alleged four causes of action: first, unlawful discrimination and retaliation by Defendants for engaging in activity protected under 12 U.S.C. §1831j, and second, under 31 U.S.C. §5328 (collectively, "Federal Whistleblower Statutes"); third, unlawful discrimination and retaliation in violation of the clear public policy of Ohio; and fourth, prohibited discriminatory and retaliatory conduct in violation of Ohio Rev. Code §4113.52 ("Ohio Whistleblower Statute"). Hill sought in excess of $75,000 in, *inter alia,* compensatory and punitive damages, interest, and attorney's fees.

Defendants counterclaimed, alleging frivolous and baseless conduct prohibited under Ohio Rev. Code §2323.51, Ohio Civ. R. 11 and Fed. Civ. R. 11. Defendants filed a motion for summary judgment, and Hill filed motions to dismiss Defendants' counterclaim, to strike certain affidavits, and to strike Defendants' motion for summary judgment. On June 15, 2007, the district court granted Defendants' motion for summary judgment, and Hill's motion for judgment on the pleadings on the counterclaim, which rendered Hill's remaining motions moot.

## II

We review de novo an order granting summary judgment. *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). Summary judgment is appropriate when there are no issues of material fact in dispute and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, we must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). We also review de novo a district court's dismissal of a claim pursuant to a Rule 12(c) motion. *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d

- 7 -

634, 643 (6th Cir. 2003). "We read the *Twombly* and *Erickson* decisions in conjunction with one another when reviewing a district court's decision to grant a motion to dismiss for failure to state a claim or a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12." *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295-96 (citing *Erickson v. Pardus*, 127 S. Ct. 2197 (2007); *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007)). Dismissal on a Rule 12(c) motion is appropriate when the factual allegations contained in the complaint, accepted as true, do not show that the pleader is entitled to relief. While "[f]actual allegations must be enough raise a right to relief above the speculative level," *Twombly*, 127 S. Ct. at 1964-65, "[s]pecific facts are not necessary," *Erickson*, 127 S. Ct. at 2200.

**A. Hill's Wrongful Termination Claim under the Ohio Whistleblower Statute**

Hill contends that the district court erred in granting summary judgment in favor of Defendants on Hill's claim of wrongful retaliation in violation of the Ohio Whistleblower Statute. The Ohio Whistleblower Statute grants employees protection in three scenarios, and states in relevant part:

> § 4113.52. Right of employee to report violation of law by employer or fellow employee
>
> (A) (1) (a) If an employee becomes aware in the course of the employee's employment of a violation of any state or federal statute or any ordinance or regulation of a political subdivision that the employee's employer has authority to correct, and the employee reasonably believes that the violation is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, a felony, or an improper solicitation for a contribution, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation. If the employer does not correct the violation or make a reasonable and good faith effort to correct the violation within twenty-four hours

after the oral notification or the receipt of the report, whichever is earlier, the employee may file a written report that provides sufficient detail to identify and describe the violation with the prosecuting authority of the county or municipal corporation where the violation occurred, with a peace officer, with the inspector general if the violation is within the inspector general's jurisdiction, or with any other appropriate public official or agency that has regulatory authority over the employer and the industry, trade, or business in which the employer is engaged.

(b) If an employee makes a report under division (A)(1)(a) of this section, the employer, within twenty-four hours after the oral notification was made or the report was received or by the close of business on the next regular business day following the day on which the oral notification was made or the report was received, whichever is later, shall notify the employee, in writing, of any effort of the employer to correct the alleged violation or hazard or of the absence of the alleged violation or hazard.

. . .

(3) If an employee becomes aware in the course of the employee's employment of a violation by a fellow employee of any state or federal statute, any ordinance or regulation of a political subdivision, or any work rule or company policy of the employee's employer and the employee reasonably believes that the violation is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, a felony, or an improper solicitation for a contribution, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation.

(B) Except as otherwise provided in division (C) of this section, no employer shall take any disciplinary or retaliatory action against an employee for making any report authorized by division (A)(1) or (2) of this section, or as a result of the employee's having made any inquiry or taken any other action to ensure the accuracy of any information reported under either such division. No employer shall take any disciplinary or retaliatory action against an employee for making any report authorized by division (A)(3) of this section if the employee made a reasonable and good faith effort to determine the accuracy of any information so reported, or as a result of the employee's having made any inquiry or taken any other action to ensure the accuracy of any information reported under that division. . . .

(C) An employee shall make a reasonable and good faith effort to determine the accuracy of any information reported under division (A)(1) or (2) of this section. If the employee who makes a report under either division fails to make such an effort, the employee may be subject to disciplinary action by the employee's employer, including suspension or removal,

for reporting information without a reasonable basis to do so under division (A)(1) or (2) of this section.

The district court found Hill's claim under the Ohio Whistleblower Statute deficient on two grounds. First, the district court found that Hill had not complied with the statutory requirements to claim relief under §4113.52(A)(1): in particular, Hill did not demonstrate that Defendants failed to take reasonable action to correct the misdeeds reported by Hill, and Hill did not file a written report with a proper outside agency. Second, the district court found that there is no genuine issue of material fact as to whether Hill made "a reasonable and good faith effort to determine the accuracy" of any information about the alleged violations that he reported, as required by §4113.52(B) for a claim under (A)(3), and by §4113.52(C) for a claim under (A)(1).

Hill contests both grounds for the district court's ruling. Hill argues that the district court has "erroneously *combined* the requirements" of §4113.52(A)(1) *and* §4113.52(A)(3), and that he "does not claim protections under" §4113.52(A)(1). Hill also argues that he produced "overwhelming evidence" for his good faith effort, and that, in any case, the determination of whether his efforts were reasonable and in good faith is a question of fact reserved for the jury.

The requirement to make "a reasonable and good faith effort to determine the accuracy of any information" reported applies whether Hill claims protection under §4113.52(A)(1) or under §4113.52(A)(3). Even if the district court had erroneously "combined" the requirements of two distinct subsections of the Ohio Whistleblower Statute, Hill's failure to make a reasonable and good faith effort is an independent and sufficient ground to grant summary judgment to the Defendants on this claim. It is unnecessary for us to decide whether the district court erred in applying the

requirements of both subsections of the Ohio Whistleblower Statute, because we hold that the district court correctly decided that no genuine issue of material fact exists as to whether Hill made the requisite good faith effort to be protected under that statute.

The Supreme Court of Ohio has explicitly held that if an employee reports a violation of a statute and "that violation is a criminal offense and is likely to cause a hazard to public health, *each* informational component of that report -- the violation, criminality, and risk to public safety -- is 'information so reported'" under the antiretaliation provisions of the whistleblower statute. *Fox v. Bowling Green*, 668 N.E.2d 898, 901 (Ohio 1996) (emphasis added). An employee is protected from retaliation "as long as he made a 'reasonable and good faith effort to determine the accuracy' of *each* informational element." *Ibid*. (emphasis added). Thus, Hill needed to establish that he has made a reasonable and good faith effort to determine the accuracy of the three informational components applicable to his claim: the violations, the criminality of the violations, and the felonious character of the criminal violations.

Hill does not explicitly claim that he has made the requisite effort with regard to each of the three informational components. Instead, Hill lists the following actions taken by him as evidence that he made a reasonable and good faith effort in general. Hill (1) "gathered the concerns of multiple employees"; (2) assembled these concerns "into a written report," which he presented to Nabors; (3) sought "additional information" on a credit card account when another employee brought her concerns to him, which entailed "obtaining online account information"; (4) reviewed "approximately 54 pages of MasterCard statements, which revealed the specifics of Pucci's activity"; (5) "pulled files to review loans" made to Stacy Mitchell (individual with the Ohio address, whose

loan documents were delivered to New Jersey) and singer Colleen Kiley; (6) "read the statutes relating to embezzlement and bank fraud."

Hill does demonstrate that he transmitted the concerns of multiple employees to Nabors. However, as the district court points out, serving as a "mere conduit" of information does not by itself amount to a reasonable and good faith effort. Hill invokes the authority of the Ohio Supreme Court's ruling in *Contreras v. Ferro Corp.,* 652 N.E.2d 940, 954 (Ohio 1995), which points out the possibility that the same employee may be both a recipient and a reporter of information, and that therefore, "each employee in the chain of command who receives the information and reports it to his or her supervisor is protected from retaliatory action *if the manner in which the information is reported complies with the requirements of the statute.*" (emphasis added). *Contreras* does not help Hill's attempt to establish his good faith effort: it is clear that *only* those employees in the chain of command – only those "conduits" – who satisfy the requirement to make a reasonable and good faith effort to determine the accuracy of information they received and passed on are protected under the statute. In no way does the language in *Contreras* exempt Hill from independently establishing a good faith effort.

Second, Hill claims that he assembled the concerns brought to him by other employees "into a written report," which he then presented to Nabors. As the district court concluded, Hill did no more than "hand[] over documents that other employees had assembled" to Nabors. *Hill v. Mr. Money Fin. Co.*, 491 F. Supp. 2d 725, 732 (N.D. Ohio 2007). Defendants assert that Hill "compiled no report and handed Nabors fifty-four (54) pages of credit card documents and a few loan documents." The voluminous evidentiary record submitted by both parties does *not* establish what

Hill urges is a key part of his good faith effort, the assembling of information into a "*written* report."

The evidentiary record suggests strongly that the 54 pages Hill handed over to Nabors to support

allegations of Pucci's misconduct were credit card and loan documents accessed and printed by other

employees. Hill himself describes the materials he transmitted to Nabors as consisting of Mastercard

statements and loan documents. The closest Hill comes in his sworn deposition to substantiating the

claim of having actually written anything beyond what was given to him by other employees is in

the following statement in his deposition: "I told him [Nabors] about the misconduct. I gave him the

54 pages, and I had written notes on each section." With regard to credit card statements, Hill's

deposition states that another employee printed *all* the pages that Hill gave to Nabors:

> Q. Did you have available to you the credit card information from Mr. Pucci?
> A. No.
> Q. Was it on the computer?
> A. Only after they told me about these incidences. There was a girl who worked there, Dee Patrick, who had to access the account online and pay it electronically, and from that *she printed me all the pages I gave to Mr. Nabors*. I had never accessed that before.

(emphasis added). At another point in his deposition, Hill confirms that all the documents, not just

the credit card statements noted above, were brought to him by other employees:

> Q. Mr. Hill, if I understand your testimony, the employees at Mr. Money laid out for you – they came in with a group of documents and laid out for you this entire case that you then reported to Mr. Nabors; is that correct?
> A. Yes.

This quoted record is also pertinent to the third and fourth set of actions Hill cites as evidence of his

good faith effort to determine that Pucci's actions were illegitimate or illegal, (3) his seeking

"additional information" on a credit card account when another employee brought her concerns to

him, which entailed "obtaining online account information", and (4) his review of the "approximately 54 pages of MasterCard statements, which revealed the specifics of Pucci's activity." Hill's statements make evident that the "obtaining" of additional credit card information was done by employee Dee Patrick, and not himself. The record likewise fails to show that Hill sought any information *beyond* that contained in the statements printed by another employee. He states that he did not know nor seek to ascertain whether the bank conducted an audit on the credit card or exactly how much money Pucci paid back, if any.

The most effort Hill exerted with regard to the information contained in the credit card statement is totaling the card charges attributable to Pucci, without explicitly distinguishing between legitimate business expenses and illegitimate charges. The attention Hill accorded to the credit card statements may indeed be a "review" of the information contained therein, but a review of a most superficial kind. Next, Hill maintains that he investigated the allegedly illegal loans made by Pucci by pulling files on these loans made to Stacy Mitchell and singer Colleen Kiley. Hill's statements on the record do confirm that he pulled the loan file on Stacy Mitchell; but, with regard to the Colleen Kiley loan, Hill states in his deposition that this was a "file that Tara and Lisa [i.e. other employees] brought in to me."

To sum up, treating the facts supported by the record in a light most favorable to Hill, the most that Hill has done to determine the accuracy of Pucci's violations – the first informational component subject to the good faith requirement – is the following: he looked at the credit card statements and verified the presence of items that were likely to be improper business expenses; he calculated the total charges, including the allegedly illegitimate charges, made by Pucci on the

company credit card; and he pulled a file on a loan made to Stacy Mitchell, which may have led Hill to verify the reasonableness of information first reported to him by other employees, because the loan was improperly made to an Ohio resident, but mailed to a New Jersey address.

Hill put considerably less effort into determining whether Pucci's violations were *criminal*, and apparently no effort into determining whether they were likely to be *felonious*. With regard to the criminality of Pucci's conduct, Hill states no more than that he had read "the statute" on embezzlement and bank fraud, although he did not remember it "verbatim," and did not specify whether this occurred at some distant time in the past, or after other employees brought him the documents suggesting that Pucci committed criminal violations.

Crucially, Hill does not claim or point to any part of the record that would establish the requisite effort with regard to determining that Pucci's criminal violations *rose to the level of felonies*. Merely stating in a sworn affidavit that he "believed that these serious crimes were felonies" may conceivably satisfy the requirement that the employee reasonably believed a felony occurred, but it does not satisfy the requirement to make a reasonable and good faith effort to determine the accuracy of that belief. Even if it is not inconceivable that a jury would find reasonable and good faith effort with regard to the first informational component (occurrence of misconduct), it is far less conceivable with regard to the second informational component (criminality of misconduct), and wholly inconceivable with regard to the third informational component (felonious nature of misconduct). Therefore, we affirm the district court's decision as to Hill's claim under the Ohio Whistleblower Statute, on the grounds that Hill did not proffer

sufficient evidence to create a genuine issue of material fact as to his reasonable and good faith effort to determine the accuracy of the information he reported.

**B. Hill's Wrongful Termination Claim under Federal Whistleblower Statutes**

The district court ruled that Hill did not establish that his conduct qualifies for whistleblower protection under Federal Whistleblower Statutes, because Hill did not file protected information with the federal agencies specified in the statutes until after Defendants terminated his employment, and his "internal whistle-blowing" to Nabors and the Board members does not satisfy statutory requirements. 31 U.S.C. §5328 protects an employee "or any person acting pursuant to the request of the employee," who files information regarding "a possible violation of any provision of this subchapter or section 1956, 1957, or 1960 of title 18, or any regulation under any such provision," from retaliation by the employer, if the employer is a "financial institution[] or nonfinancial trade or business." §5328(a). 12 U.S.C. §1831j protects an employee "or any person acting pursuant to the request of the employee," who files information regarding, in the relevant part, "a possible violation of any law or regulation," from retaliation by the employer, if the employer is an "insured depository institution[]." §1831j(a). Both statutes require that information be filed with specific federal agencies: "the Secretary of the Treasury, the Attorney General, or any Federal supervisory agency" in the case of 31 U.S.C. §5328(a), and "any Federal Banking agency or to the Attorney General" in the case of 12 U.S.C. §1831j(a). We need not decide whether Mr. Money and First Citizens are covered under either statute: for the sake of argument, we assume, as did the district court, that Defendants are covered by one of the statutes.

Hill argues that whistle-blower statutes ought to be construed liberally to protect internal whistle-blowing. Hill further argues that he "has not merely rested upon his internal complaints to demand extension of federal whistleblower protection," but also "submitted his complaint to the Federal Reserve through Doski as a conduit, and announced a clear intention to specifically comply with the requirements of the Federal Whistleblower Statutes in his April 5, 2002 letter by filing a SAR."

The district court has adequately addressed Hill's first argument regarding internal whistle-blowing. Hill urged that *all* federal whistleblower statutes should be "broadly construed so as to include internal, or 'intracorporate' whistleblowing, even where the conduct involved did not come under the literal terms of the statute." (quoting *Neal v. Honeywell, Inc.*, 826 F. Supp. 266, 270 (N.D. Ill. 1993), aff'd, 33 F.3d 860 (7th Cir. 1994)). As the district court correctly reasoned, when statutory language of whistleblower provisions is ambiguous and/or broad, courts do tend to construe the language "in favor of protecting the whistleblower." *Hill*, 491 F. Supp. 2d at 735 (citing *Haley v. Retsinas*, 138 F.3d 1245, 1250 (8th Cir. 1998)). The decisions that Hill relies on to support a liberal construction all interpret other federal whistleblower provisions with different statutory language. *E.g.*, *Neal*, 33 F.3d at 861 (holding that participating in the "investigation for initiation of, testimony for, or assistance in an action filed or to be filed" under the False Claims Act protects whistleblowers even if no formal action was filed); *NLRB v. Scrivener*, 405 U.S. 117, 125 (1972) (holding that protection from retaliation for "fil[ing] charges or giv[ing] testimony" under the National Labor Relations Act extends to an employee who gave a written sworn statement to an NLRB examiner); *Kansas Gas & Elec. Co. v. Brock*, 780 F.2d 1505, 1510-12 (10th Cir. 1985)

(holding that "[assisting or participating in a] proceeding or in any other action" to blow the whistle on the employer included filing internal complaints under the Energy Reorganization Act); *Jones v. Tennessee Valley Authority*, 948 F.2d 258, 264 (6th Circ. 1991) (same).

Judge Frank Easterbrook, while affirming the lower court's decision in *Neal*, pointedly refutes the rule of statutory construction adopted by that lower court and now urged by Hill: "[T]here is no rule that all statutes addressing related topics mean the same thing – let alone that all statutes should receive the reading most favorable to whistleblowers." *Neal*, 33 F.3d at 863. The district court was likewise correct in its refusal to adopt a uniform rule of construction for a variety of different statutes. We agree with the district court's reasoning:

> The differences between the language of the above-discussed statutes and the statute at issue here are glaring. . . . [W]hen the meaning of the statute is unclear from its text, courts tend to construe it broadly, in favor of protecting the whistleblower. *While there is ambiguity in each of the provision[s] that other courts have interpreted to include internal whistle-blowing, section 1831j conspicuously lacks such ambiguity. . . .* The language of sections 1831j and 5328(a) is clear and unambiguous. If the plaintiff did not report the relevant information, himself or through a conduit, to a federal banking agency, the Attorney General, the Secretary of the Treasury, or any federal supervisory agency, before being discharged or otherwise discriminated against . . . then the plaintiff is not protected by these whistle-blower protection laws.

*Hill*, 491 F. Supp. 2d at 735-36 (internal quotation marks and citation omitted; emphasis added). Indeed, the Eleventh Circuit has considered the same statutory language of §1831j(a) now at issue and came to the same conclusion as the district court: an employee's "internal reports are not protected disclosures under §1831j(a)(1)." *Lippert v. Community Bank, Inc.*, 438 F.3d 1275, 1280 (11th Cir. 2006). We uphold the district court's decision to rely on a plain reading of unambiguous

statutory language – as did the Eleventh Circuit in *Lippert* – rather than to analogize to other courts' broad interpretations of completely different statutory language.

The same considerations militate against Hill's claim that his conduct was protected under the Federal Whistleblower Statutes because Defendants preemptively retaliated, before Hill had a chance to file the information. Hill submits that he is entitled to protection because "he announced a specific intention to comply with federal law and was preemptively terminated." Although the district court did not consider this question explicitly, it is difficult to see why the argument for extending the clear and unambiguous statutory language to cover preemptive retaliation does not fail for the same reason as the argument for extending the same language to cover internal whistle-blowing. The same plain and unambiguous language that excludes internal whistle-blowing also excludes an unrealized intention to blow the whistle. Although Hill "had threatened to file an SAR on more than one occasion, and even announced his intent to do so, [he] did not actually file an SAR until after Defendants fired him." Statutory language is clear that retaliation must *follow* the provision of information to a specified federal authority.

Hill further argues that he in fact complied with the statutory terms permitting the filing of information by "any person acting pursuant to the request of the employee," because he "submitted his complaint to the Federal Reserve through Doski as a conduit." Because Hill did not raise this argument explicitly before the district court, that court did not engage its merits. Hill offers no authoritative support for his contention that his actions constituted a "request" to Doski to make a protected disclosure to the appropriate federal authorities. Hill does not clearly explain how the fact pattern established by the record shows that Hill's letter to the Board of Directors and to Doski

constituted a request, and that Doski contacted the Federal Reserve pursuant to that request.

However, even if we assume, *arguendo*, that Hill's letter was a valid "request," this line of argument

suffers from two serious flaws: first, the record cannot be read to show that Doski acted "pursuant"

to Hill's request. Instead, she acted pursuant to McGookey's request to contact FinCEN, and then

pursuant to FinCEN's direction to contact the Federal Reserve. Second, even if we were persuaded

that Doski did act pursuant to Hill's request to "provide information [to a specified federal agency]

regarding[] a possible violation of [a] law or regulation," §1831j(a)(1), Doski's communication with

the Federal Reserve is quite far from the kind of "information" contemplated by the federal statutes.

Doski's email to the Federal Reserve was a question regarding whether an SAR must be filed with

regard to only one of the allegations made by Hill:

> I spoke with a representative from FinCEN this afternoon and he told me to run my question past you. The former president of our finance co. made a loan to an individual with an in-state address, but closed the loan through the mail while she was on assignment in New Jersey. Under FTC law, finance companies must close their loans in house. What ramifications may the finance co. face in this one? There was a question of whether a SAR must be filed . . . .

Doski's question about whether protected information needed to be filed does not amount to actually

filing information: she provided no meaningful details on the violator or the violation. For these

reasons, we affirm the district court's dismissal of Hill's claim under 31 U.S.C. §5328 and 12 U.S.C.

§1831j.

**C. Hill's Wrongful Termination Claim under Ohio Public Policy**

Ohio law recognizes a public policy exception to the employment-at-will doctrine. *See*

*Greeley v. Miami Valley Maintenance Contractors, Inc.*, 551 N.E.2d 981 (Ohio 1990); *Painter v.*

*Graley*, 639 N.E.2d 51 (Ohio 1994). In *Collins v. Rizkana*, 652 N.E.2d 653, 657-58 (Ohio 1995), the Ohio Supreme Court set out the elements of the wrongful discharge tort in violation of public policy:

> 1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).
>
> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).
>
> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).
>
> 4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

*See also Kulch v. Structural Fibers, Inc.*, 677 N.E.2d 308 (Ohio 1997). "[T]he clarity and jeopardy elements of the tort of wrongful discharge are questions of law to be determined by the court." *Id.* at 321, citing *Collins*, 652 N.E.2d at 658.[2]

The district court dismissed Hill's claim that his termination was in violation of Ohio public policy as set forth in the Ohio Whistleblower Statute, the Federal Whistleblower Statutes, and the "policy of encouraging the reporting of criminal activity." The district court found that because Hill "did not report criminal activity within the corporations to anyone outside of the companies with any authority or oversight over the Defendants' industries until after he was terminated," Hill's actions "do not fulfill the goals of these statutes or of the public policy behind these statutes." *Hill*, 491 F. Supp. 2d at 736. Hill contends that the district court erroneously treated this claim as identical with

---

[2] The remaining two elements are questions of fact. *Kulch*, 677 N.E.2d at 321; *Collins*, 652 N.E.2d at 658.

the statutory claims, and that to survive summary judgment Hill has only to "identify a source of clear public policy and show that the retaliation he suffered jeopardizes the identified public policy."

Insofar as the asserted public policy is expressed in the Ohio Whistleblower Statute, and insofar as Hill did not comply with that statute's requirements, the district court correctly dismissed Hill's claim. "The obvious implication of *Contreras* is that an employee who fails to strictly comply with the requirements of R.C. 4113.52 cannot base a *Greeley* claim *solely upon the public policy embodied in that statute*." *Kulch*, 677 N.E.2d at 323 (emphasis added).

Similar reasoning applies to the clear public policy as expressed in the Federal Whistleblower Statutes. If Hill's claim under either of those statutes fails, then his public policy claim based thereupon must also fail. Courts interpreting Ohio law have held that federal statutes may form a source of a clear public policy for the purposes of the wrongful discharge tort independent of the statutory whistleblower claims, but the kinds of federal statutes at issue were fundamentally different from the Federal Whistleblower Statutes. In particular, in *Kulch* and *Pytlinski v. Brocar Products, Inc.*, 760 N.E.2d 385 (Ohio 2002), the Supreme Court of Ohio upheld the existence of a clear public policy of workplace safety based on the Occupational Safety and Health Act (OSHA) regulations. The Federal Whistleblower Statutes are *not* analogous to OSHA regulations in a crucial respect: OSHA regulations "specifically prohibit[] employers from retaliating against employees . . . who file OSHA complaints," but they *do not* "provide an employee with a private right of action against the employer." *Kulch*, 677 N.E.2d at 321, citing 29 U.S.C. §660(c)(1). The Federal Whistleblower Statutes on the other hand, expressly regulate the manner in which actions for retaliation against

bank employees are to be pursued, and there is no reason to treat Hill's claim on the basis of policy rooted in these statutes differently from his claim on the basis of policy rooted in the Ohio Whistleblower Statute. In other words, where the sole source of the asserted public policy is a whistleblower statute, state or federal, an employee must comply strictly with the dictates of the statute. *See, e.g., Kulch*, 677 N.E.2d at 322-23 ("By imposing strict and detailed requirements on certain whistleblowers and restricting the statute's applicability to a narrow set of circumstances, the legislature clearly intended to encourage whistleblowing only to the extent that the employee complies with the [statutory] dictates.")

Hill claims that his termination violated clear public policies beyond those embodied in the Ohio and Federal Whistleblower Statutes: in particular, he cites the "clear public policy in favor of reporting crimes," the policy in favor of "reporting possible criminal conduct of another employee," as well as the "clear public policy prohibiting dismissal of bank employees in retaliation for reporting unlawful conduct by the officers of financial institutions." The district court does not expound at length on these claims, but it is evident that its dismissal rests on its prior holding that there is no genuine material issue as to whether Hill *reported* anything outside the company – and as we agreed above, he did not. Hill's conduct did not fulfill the goals of the identified public policies, not solely because Hill did not comply with statutory requirements, but also because Hill failed to *report*, as required by the clear public policies he identified.

Holding that a public policy in favor of *reporting* crimes requires that a possible crime actually be reported is not at odds with lower court decisions Hill cites in support of his claim. Hill

advances two propositions: first, that there is a clear public policy in favor of reporting crimes, and second, that a claim under this policy does not require "reporting to an outside agency." Hill relies on two distinct sets of cases to support these two propositions. However, the cases Hill identifies to support the second proposition do not involve the same clear public policy at issue here; in particular, *all* of these cases deal with the *policy favoring workplace safety*. *E.g., Pytlinski*, 760 N.E.2d 385 (no filing of a complaint with a specific entity required to sustain a *Greeley* claim in violation of the public policy favoring workplace safety); *Dohme v. Eurand Am., Inc.,* 868 N.E.2d 701 (Ohio Ct. App. 2007) (same); *Miller v. MedCentral Health System, Inc.*, 2006-Ohio-63, 2006 Ohio App. LEXIS 51 (Ohio Ct. App. 2006) (unreported) (no report to a specific entity required to sustain a *Greeley* claim in violation of the public policy favoring the safekeeping of food and workplace safety). Hill does not assert that his conduct furthered the public policies in favor of workplace safety (or safekeeping of food); therefore, these decisions are inapposite.

Crucially, the plaintiffs who did state a valid cause of action under *Greeley* in the set of cases Hill identifies to support his first proposition, the existence of a clear public policy in favor of reporting crimes, all fulfilled the requirement to *report* alleged crimes. *Dunnigan v. City of Lorain*, 2002-Ohio-5548, 2002 Ohio App. LEXIS 5563 (Ohio Ct. App. 2002) (an employee discharged for *reporting an alleged crime to the police* stated a valid *Greeley* claim in violation of the public policy favoring reporting crimes); *Bailey v. Priyanka Inc.*, 2001-Ohio-1410, 2001 Ohio App. LEXIS 4558 (Ohio Ct. App. 2001) (same). Therefore, there is no relevant legal authority to support his contention

that external reporting is not required to sustain a *Greeley* claim for wrongful discharge in violation of a clear public policy to *report* crimes.

Hill asserts the existence of another clear public policy "prohibiting dismissal of bank employees in retaliation for reporting unlawful conduct by the officers of financial institutions," but does not clearly identify which specific "state or federal constitution, statute or administrative regulation" manifests that policy. Hill lists a number of state and federal laws that he characterizes as "sources of public policy" – namely, "the Ohio Mortgage Loan Act, 18 U.S.C. §656 (Theft, Embezzlement, or Misapplication by bank employee), 18 U.S.C. §1005 (Fraud and False Statements), 18 U.S.C. §1344 (Mail Fraud-Bank Fraud), 18 U.S.C. §1342 (Mail Fraud – Fictitious Name or Address)," the Ohio Whistleblower Statute, and the Federal Whistleblower Statutes. However, Hill does not match the "source" to the clear policy: we are left guessing as to which of these numerous statutes manifests a clear public policy against the "dismissal of bank employees in retaliation for reporting unlawful conduct by the officers of financial institutions," let alone what specific statutory language expresses said policy clearly. Even if such a policy were clearly manifest, this claim fails for the same reasons as above – there was no "reporting" of violations to external authorities. Since Hill did not establish the clarity element of the tort, whether he has established the jeopardy element is moot. For these reasons, we affirm the district court's dismissal of Hill's wrongful discharge claim in violation of Ohio public policy.

**III**

**A. Defendants' Claim for Sanctions on the Basis of Frivolous Conduct**

The Defendants present five distinct questions of law raised by the district court's decision to grant Hill's motion to dismiss defendants' counterclaim. However, the essence of the issue presented on appeal may be economically boiled down to one. Defendants protest that the district court ignored the basis for their counterclaim in both state and federal law (under Ohio Civil Rule 11, Ohio Rev. Code §2323.51 and Fed. Civ. R. 11, respectively), by "[a]ssuming for the sake of argument that the Ohio statutes are applicable in federal court . . . ." However, if Hill's claims were not frivolous as a matter of law, the particular rule violated by the allegedly frivolous conduct matters very little. Absence of frivolous conduct as a matter of law defeats Defendants' counterclaim under any theory, since Defendants claim relief under Ohio Civil Rule 11, Ohio Rev. Code §2323.51 and/or Fed. R. Civ. P. 11 for the same allegedly frivolous conduct.

The frivolous conduct alleged by Defendants amounts to the following. First, Hill, together with his counsel, contrived a situation in an attempt to create a whistleblower claim. Second, Hill engaged in forum shopping, by pursuing "virtually identical actions . . . in state court, then federal court, then state court, and then again in federal court . . . ." Third, Hill's claims against First Citizens were frivolous, because Hill was never an employee of First Citizens.

The district court's holding that "frivolous conduct has not been sufficiently established" properly applies to each one of the three allegations. Defendants did not demonstrate any set of facts consistent with their counterclaim under which they would be entitled to relief. Defendants' first contention, that Hill and his counsel "contrived a situation in an attempt to create a whistleblower claim" rests on the claim that Hill must have had the assistance of legal counsel in composing his

April 5, 2002 letter to the Board of Directors, because the letter was "typed on a word processor at the offices of his legal counsel." Taking these allegations as true, Hill's foreseeing that he would be terminated and seeking legal counsel prior to termination does not render his whistleblower claim frivolous. Likewise, multiple filings and an improper designation of First Citizens as a defendant are not obviously and unquestionably frivolous.

Federal Rule of Civil Procedure 11 "affords the district court the discretion to award sanctions when a party submits to the court pleadings, motions or papers that are presented for an improper purpose, are not warranted by existing law or a non-frivolous extension of the law, or if the allegations and factual contentions do not have evidentiary support." *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 510 (6th Cir. 2002) (citing Fed. R. Civ. P. 11(b)(1)-(3)). Although the district court did not consider the imposition of Rule 11 sanctions explicitly, it cannot be said that the conduct identified by Defendants obviously signals the presence of an improper purpose behind any pleading, motion or paper. Nor can it be said that Hill's conduct clearly entailed submitting to a court any pleadings, motions or papers that are unwarranted by a non-frivolous extension of the law. On the contrary, the district court was correct in determining that the issues presented implicate important substantive questions of law. Finally, although Hill did not prevail on any of his claims, his failure to survive summary judgment is not decisive evidence that his allegations were wholly unsupported by evidence: indeed, both parties have expended much effort on arguments of substantive law. Moreover, we have previously held that "the imposition of sanctions for violations [is] discretionary, rather than mandatory." *Ridder v. City of Springfield*, 109

F.3d 288, 293 (6th Cir. 1997). Even if the conduct Defendants allege is frivolous, and thus *may* be sanctionable under Ohio or federal rules, the conduct is not so egregious so as to *require* an imposition of discretionary sanctions.

Finally, Defendants raise on appeal a new ground for imposing sanctions, the court's exercise of its inherent powers. This court has affirmed the district court's inherent authority to impose sanctions, even if the sanctionable conduct is not a violation of any rule. *E.g., First Bank of Marietta*, 307 F.3d at 512. As the Supreme Court explained:

> [A] court may assess attorney's fees when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." In this regard, if a court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's fees against the responsible party, as it may when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order [ ].

*Ibid.*, quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (citations omitted). The alleged frivolity is certainly not the kind of conduct that "defile[s]" "the very temple of justice." *Ibid*. Thus, we affirm the district court's dismissal of the Defendants' counterclaim.

## IV

For the reasons set out above, we AFFIRM the district court's grant of summary judgment in favor of Defendants, and the grant of judgment on the pleadings in favor of Hill.